Filed 12/30/13  In re Robert H. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Robert H., a Person Coming Under the Juvenile Court Law. | |
| DEL NORTE COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NINA P.,<br><br>        Defendant and Appellant. | A139958<br><br>(Del Norte County<br>Super. Ct. No. JV-SQ-13-6014) |

One-month-old Robert H. was removed from the care of his mother Nina P. (Nina or Ms. P.) and father James H. (James or Mr. H.) by the Del Norte County Department of Health and Human Services (Department) due to the parents' failure to seek medical care when he became seriously ill.  The Department also suspected that the parents had substance abuse issues and a violent relationship, and that James abused Robert's seven-year-old half-brother, Roman.[1]  It provided family reunification services, but at the six month review the juvenile court terminated services due to the parents' failure to make sufficient progress on their case plans.

---

[1] James was not Roman's father.  Additionally, this petition involves only the reunification services provided to Nina as to Robert.  Accordingly, we will omit further details concerning Roman and James, except where relevant to the issues before us.

1

Nina petitions for an extraordinary writ, seeking reversal of the order terminating reunification services and setting a Welfare and Institutions Code section 366.26[2] permanency hearing for January 24, 2014. Her contentions are two: (1) the Department failed to provide adequate reunification services, and (2) the juvenile court's finding that she failed to make sufficient progress on her case plan was unsupported by substantial evidence. We conclude Nina's arguments lack merit, and we deny the petition on its merits.

## BACKGROUND

### Detention

On February 6, 2013, Nina and James left one-month-old Robert in the care of his paternal grandmother because he would not stop crying. Noticing that the infant's lips and fingers were blue, the grandmother sought emergency medical attention. Robert was diagnosed with a serious respiratory virus and possible pneumonia and hospitalized for five days. In the notes regarding his progress, hospital workers related difficulties waking the parents to care for him, with the parents claiming they were "too tired."

Two days after Robert's hospitalization, James contacted his mother, instructing her to pack their belongings and bring Roman to the hospital because they were going to leave. A social worker went to the residence where the family was then staying (with nine other people) to speak with Roman. The home smelled strongly of marijuana, although the people who were present denied recent use. Fearing that James and Nina were going to flee with the two children, the social worker, with Nina's reluctant consent, moved Roman to the grandmother's home.

On February 11, when Robert was ready to be discharged from the hospital, the Department moved him to emergency foster care. That same day, it filed a section 300 petition, alleging that, due to their substance abuse issues, the "domestically volatile" nature of their relationship, and their failure to timely seek medical care for Robert, the

---

[2] All subsequent statutory references are to the Welfare and Institutions Code.

2

parents failed to protect him within the mean of subdivision (b). The petition also alleged that James abused Roman within the meaning of subdivision (j).

In its detention report, the Department recommended that both children be detained. At a February 13 detention hearing, the court adopted the Department's recommendation and continued the matter for a contested jurisdictional hearing.

**Jurisdiction**

In a March 6 jurisdictional report, the Department recommended that the court sustain the allegations in the petition. It provided details concerning the parents' drug use, noting that although Nina and James initially denied using drugs, they both later admitted to smoking marijuana, with Nina stating she used it "occasionally" and took about four to five "hits" off a pipe each day. On February 13, they submitted to a drug test, with positive results for methamphetamine and marijuana. When requested to test again on February 21, both parents refused, stating they were waiting for a court case. After they were shown the detention order requiring them to drug test, they finally agreed, again testing positive for the same substances.

The Department also provided further details regarding the social worker's February 8 conversation with Roman. He told the social worker that he did not think Nina and James liked him very much and that he did not feel safe with them. He also told her that James slapped him in the face and on his hands. Later that same evening, the social worker was at the grandmother's house when James called. He demanded that the grandmother pack their belongings and bring Roman to the hospital. She refused, advising James to cooperate with the Department. He became very angry, blaming her for the Department's involvement and threatening that she would "be sorry."

The Department had "concerns regarding Mr. H.'s and Ms. P.'s ability to focus on cooperating with the Department and developing and participating in a case plan. In conversations with both individuals, the Department has noticed a trend in [remaining] fixated on outside sources being the culprit for the Department's involvement instead of accepting that the Department's involvement in their lives is directly related to the lifestyle choices that they themselves have made. This mentality also directly affects the

3

parent's ability to make appropriate lifestyle choices that would address the concerns set forth by the Department."

On March 15, following a contested jurisdictional hearing, the court found the allegations in the petition to be true and set the matter for disposition on March 29.

**Disposition**

The Department filed its disposition report on March 27, recommending that the parents receive reunification services. It noted that Nina initially denied any incidents of domestic violence between her and James. Two days before the report was filed, however, the social worker asked Nina about a bruise on her arm, and she admitted James had inflicted it. She described how, during fights, he would become physically aggressive, getting in her face and pushing her. The Department noted that Nina exhibited other behaviors typical of a victim of domestic violence. James's mother also confirmed that James was verbally abusive to Nina and Roman.

The Department recommended that Nina undergo a substance abuse assessment at Alcohol and Other Drugs (AOD) and a mental health assessment, and complete the Incredible Years parenting education program. Despite initial resistance, Nina had agreed to participate in the services recommended by the Department, although she had not scheduled the assessments as she had been advised to do.

Regarding visitation, the Department related that the parents were receiving five hours per week of joint visitation with Robert and one hour with Roman. As of March 27, Nina had missed nine visits with Robert, and James had missed ten. Nina was also receiving an additional four hours per week with Roman, but had only attended one of five visits.

In its "assessment/evaluation," the Department summarized: "Both Ms. P. and Mr. H. have a documented history of substance abuse and have yet to begin to address them. The Department has concerns over whether or not both parents are in a position to address their substance abuse problems. The Department is also concerned about Ms. P. and Mr. H.'s abilities to make long term adjustments. In conversations with both parents, it is noted that they still continue to remain fixated on only what they can do immediately

4

to have the children returned to their care, instead of purs[u]ing and completing services that would address the long term issues. Additionally, the Department is concerned about the possible domestic violent relationship between Ms. P. and Mr. H. and how neither parent is willing to completely admit to there being a problem. In conversations with both parents (both jointly and solo), both individuals have made statements to the Department about physical aggression occurring between them when they fight. When asked for further clarification regarding these fights, both parties will often stop the communication and cite that they are worried about 'causing more problems for the other one' rather than working with the Department to address this potential problem. The Department also has a concern about Ms. P.'s lack of emotional bond with her oldest child, Roman, and her reluctance to visit with him alone despite that fact that she is aware that Roman requested some one-on-one time with her."

The Department's proposed case plan established the following objectives for Nina: (1) maintain a relationship with her children by following the conditions of the visitation plan and developing a strong relationship with them; (2) developing the necessary parenting skills to enable her to consistently, appropriately, and adequately parent her children; (3) comply with medical or psychological treatment; (4) develop alternative coping skills to resolve domestic violence concerns; and (5) refrain from drug use and comply with drug testing requirements. Nina's responsibilities included participating in a mental health assessment and following the recommendation of the service provider; completing the Harrington House domestic violence program; completing the Incredible Years parenting education program; and participating in a substance abuse assessment through AOD, following the recommendation of the service provider, and submitting to random drug testing.

At the March 29 dispositional hearing, the court made findings and orders on the record, including ordering the Department to provide the parents with family reunification services and adopting the proposed case plan. After having done so, however, it discovered a notice issue and vacated its findings and orders, continuing the matter to April 12 for further review. The March 29 findings and orders were

subsequently adopted, effective April 12, and the matter was continued to September 13 for a six-month review.

### The Department's Six-Month Review Report

In its September 10 six-month review report, the Department recommended termination of reunification services for Nina, stating: "Ms. P. has failed to address the concerns that brought both of her children into the custody of the Department and has exhibited minimal effort if any in working her court ordered case plan. Ms. P. was referred to all of her services in the beginning stages of this review period and was even transported multiple times by both the social worker assigned to the case and the social service aide in the hopes of completing her assessment and engaging in services. Additionally the Department is unable to confidentially [*sic*] state that given an additional six-months of service, Ms. P. would be able to make substantial progress on her case plan. Ms. P. has continued to express to the Department her belief that she did not do anything wrong and that it has always been the fault of the Department, her on-again/off-again partner, Mr. H. and Mr. H.'s family. It is because of such mindset that the Department believes that even if Ms. P. were to be given the additional time that Ms. P. would be unable to make the necessary life changes to completely and fully address the issues at hand and prevent both children from re-entering the system. Despite the fact that Ms. P. loves and cares for her children, Ms. P. continues to seek out destructive and volatile relationships, use controlled substances, and not address her mental health issues; all of which were the core issues that brought her children into the care of the Department."

The Department went on to describe Nina's housing situation as "unstable." Early on in the case, Nina and James lived together with various friends and families, at one point even living in a tent. In August, James left the area, and Nina moved into transitional housing through the Department's mental health branch. As of September 6, however, she was homeless, having timed out of the transitional housing program. Additionally, since the dispositional hearing, Nina had been unable to secure stable employment. The Department attempted to strengthen her skills and job hunting abilities,

6

referring her to the Linkages program and the Workforce Center. She met with the Linkages services coordinator one time but subsequently failed to complete the assigned work.

Turning to the objectives of Nina's case plan, the Department noted that according to a parenting educator at the Incredible Years parenting program, Nina was scheduled to complete the program on September 21.

Concerning substance abuse issues, the Department noted that in May Nina was assessed at AOD but it was determined that she would not benefit from services because she had informed the counselor that she had no intention of stopping her marijuana use. This was consistent with Nina's drug test results, as she tested positive for marijuana throughout the review period.

Nina underwent a mental health assessment in July, resulting in a recommendation that she receive counseling services. She informed both the counselor and the social worker, however, that she had no intention of attending the sessions. Nina later told the social worker that her counselor told her she did not need mental health services, but when the social worker spoke to the counselor, she denied making such a statement, confirming that Nina did in fact need services. Further, in August, Nina contacted a crisis intervention team, stating that she had suicidal thoughts.

In April, the Department had referred Nina to a domestic violence education program at the Harrington House. She refused to participate, however, stating that she did not want to "be around those people." As an alternative, she was referred to the Pre-CAPT[3] program through MEND/WEND, but again refused, complaining about the length of the program. She ultimately agreed to participate but, as of August 31, had only attended the first session.

Nina was receiving five hours of weekly visitation with both children. The visits were supervised, and the Department had some concerns regarding Nina's ability to focus on both children, especially Roman. He had taken to wearing feminine clothing, which

---

[3] Pre-CAPT is a pre-child abuse prevention training program.

7

was frustrating to Nina. As a result, she made statements to him like, "You are not going to wear that," and "You are not a girl." Despite this, Nina was "relatively consistent" with her visits, although she missed several in a row without contacting the Department.

The Department was not confident that Robert and James would remain safe and healthy if returned to Nina's care, due to her "lack of involvement in her court ordered case plan, her continuous positive drug tests, and her unstable housing situation . . . ." In the words of the Department, "Given that Ms. P. has yet to internally recognize the reasons why both of her children were detained and has continued to state that 'this is not my fault,' the Department does not believe that she can make necessary decisions to avoid placing both her children in the same situation again and thus causing re-entry."

On September 19, the Department submitted an addendum to its report, appending two letters, one regarding Nina's progress in the Pre-CAPT program, the other her participation in mental health services. In the first, the Pre-CAPT counselor reported that Nina attended her intake appointment on August 15 and was enrolled in the program. According to the counselor, however, "She was very clear that she did not need the services we offer and was adamant that she is not a victim of family violence . . . ." She agreed to attend, however, only because the Department required it. Her attitude at intake was "somewhat angry and resistant," but the counselor noted that "many clients who express initial reluctance later come to engage with enthusiasm." Nina attended her group meeting on August 22, but missed the August 29 and September 5 meetings. She arrived at the September 12 meeting long after it started but was nevertheless given credit for attending.

The second letter, from a social worker in the Department's mental health branch, detailed Nina's poor engagement in mental health services. After receiving the Department's first referral for an assessment in March, three messages were left for Nina, asking her to call and schedule an appointment. When she failed to do so, her file was closed on April 4. After a second referral was received on April 24, an appointment was scheduled for April 29, but Nina failed to show. She finally participated in an assessment on May 8, but the office had to cancel a May 15 appointment, and Nina ignored multiple

attempts to reschedule. Nina finally came to a June 28 appointment and participated in the development of her treatment plan, which required her to participate in therapy. She declined to schedule an appointment to begin therapy, saying she was unsure of her schedule, and never called to make an appointment. When attempts to reach her were unsuccessful, her file was again closed. In mid-August, Nina showed up at a hospital "in crisis," but skipped her follow-up, clinic appointment. She eventually followed up with the mental health bridge team staff, but then did not return a follow-up phone call. She subsequently agreed to come in for a September 6 appointment, but did not show. She had an appointment scheduled for September 20.

### Recommendation By a Court Appointed Special Advocate

On September 10, David Gibbs, Robert's court appointed special advocate (CASA), submitted a report recommending that Robert remain a dependent in his current foster placement while Nina continue to receive reunification services.

A week later, Gibbs filed an addendum to his report, relating a recent conversation he had had with Nina. In the conversation, Nina insisted she had not done anything wrong, claiming she was set up by James and was never given a fair chance in court to explain what had happened. After Gibbs told her that she had to follow the case plan in order to regain custody of her children, Nina stated that she wanted them back and did not want them growing up in foster care like she did. When asked about her noncompliance with her case plan, Nina offered numerous excuses. As to the Harrington House domestic violence program, Nina told Gibbs she "just [couldn't] be dragged through that again because she went through that with her mom." Concerning mental health treatment, Nina said they were "rude" to her when she missed appointments. As to housing, Nina had submitted a HUD application and received an eligibility letter indicating she was on the waiting list, although the wait can be as long as two years. Regarding her failure to complete the work assigned by the Linkages program, Nina did not know how to prepare a resume nor did she have anything to put on one. She claimed that she "tried to go back" to the program but no one returned her call.

9

On a positive note, Gibbs reported that Nina was attending and "doing an awesome job" in her Incredible Years parenting class. She had, however, missed her September 17 class, which she attributed to being ill. She had only one class remaining.

Gibbs reiterated his recommendation that the court continue reunification services for six months, or three months at the very least, to see if Nina was progressing. He agreed with the Department that she had made minimal effort in her case plan, but she had made "some attempt," and he was hopeful that given the chance, she could be successful in fulfilling her case plan and reunifying with her children.

**Contested Six-Month Review Hearing**

A contested review hearing was held on October 2, with social worker Melissa Anderson the first to testify. According to Anderson, up until a week before the hearing, Nina had been living at a friend's house, but she had been asked to leave, and Anderson did not know where she was living at the time of the hearing. The Department was willing to help Nina with a security deposit or first month's rent, as long as she demonstrated she could pay the rent after that. It also provided Nina with a social service aide, who among other things was available to assist Nina look for housing. To Anderson's knowledge, however, Nina had not taken any steps to find housing.

Nina was unemployed, although Anderson thought she might be doing some babysitting. In March, the Department referred Nina to the Linkages program and the Workforce Center, and Anderson had attended a meeting with Nina and a Linkages counselor. Nina had not pursued any other Linkages services, although she had an appointment scheduled with a Workforce Center counselor the week after the hearing.

Anderson testified that according to the most recent information from the instructor, Nina had not completed her Incredible Years parenting education program because she had failed to attend her final class. Anderson attempted to contact the instructor to find out if Nina had attended a make-up class, but at the time of the hearing, she had not heard back. Anderson did not agree with CASA Gibbs's assessment that Nina was "doing an awesome job" in the program, because although she had attended the program, Anderson did not believe she had benefited from it, an opinion stemming from

10

watching Nina's interactions with Roman, in which she was short with him. Also, Roman conveyed to Anderson that his mother said very hurtful things to him during visits—for example, telling him that he did not need to visit with her anymore because she only wanted to visit with Robert—indicating that Nina had not grasped the core concepts of the parenting program.

Anderson confirmed that Nina had participated in an AOD assessment. However, her most recent drug test was in August, with a positive result for marijuana, and she had refused two requests to test in September. When Anderson spoke with Nina about her drug use, she stated that she used marijuana for medical purposes, claiming to suffer from pain in her body that was more effectively treated by marijuana than prescription pain medication. She did not, however, have a medical marijuana card, nor did she have a diagnosis from a doctor suggesting one was appropriate.

As to Nina's mental health, she had twice gone for an assessment and was assigned a counselor. Anderson spoke with the counselor, who did not think Nina was willing to participate in her treatment plan because she had stated that she did not believe she needed it and did not want to do it. Nina told Anderson that the counselor said she did not have a problem and did not need their services, but Anderson confirmed with the counselor that this was not true. When Anderson confronted Nina about this, she claimed the counselors were liars. The counselor also confirmed that Nina had contacted the crisis intervention team in August due to suicidal thoughts.

Anderson believed Nina was a victim of domestic violence and needed assistance in empowering herself. She felt that the Harrington House program would be the most beneficial and had attempted to facilitate Nina's engagement in it, providing or arranging rides on three or four occasions. Despite this, Nina refused to engage in their services. After she was referred to the Pre-CAPT program as an alternative, Nina attended the initial assessment and then one other appointment.

Nina's record on visitation was somewhat mixed, with Anderson describing it as "sometimes infrequent," "about 60 to 70 percent." She sometimes visited her children on a weekly basis, but also had periods where she neither showed up nor called to cancel.

11

Anderson also described two recent visits in which Nina became upset in front of the children. In Anderson's opinion, termination of services would likely cause Robert some emotional confusion and difficulty, "it might traumatize a little bit."

The Department provided Nina with a monthly bus pass, and the social service aide was available to assist Nina with transportation, provided she requested it at least one day ahead of time. Robert's grandmother had also provided transportation assistance. Additionally, the Department had referred Nina to other community-based resources and provided a phone with 400 minutes per month, and Anderson met with or spoke to Nina on a weekly basis to discuss her progress on her case plan.

Anderson did not believe Nina would be able to reunify with her children within the next six months because all of her service providers indicated that she did not believe there was a problem. And, according to Anderson, if a parent was unwilling to recognize the problem, treatment generally did not occur.

Nina was the second witness to testify. According to Nina, she had been staying with some friends for the past few nights, although she had not informed the Department of where she was living and did not remember the "exact address."

When asked how she would provide housing for her sons when she could not even provide it for herself, Nina responded that she planned to live somewhere less expensive. Nina was also making an effort to find employment, having scheduled an appointment to meet with a Linkages counselor two days after the hearing. When asked why she had not pursued assistance through Linkages until that time, Nina claimed she thought it was "merely a suggestion," not a necessary part of her case plan.

Nina also testified that she had received her certificate of completion of the Incredible Years parenting education program, claiming she gave it to Nancy Blankenship to give to the social worker. The educator thought she was making substantial improvements, which she had seen, as Nina described it, in her "countenance," behaviors, and attitude. Through the program, Nina had learned how to deal with temper tantrums and a lot about discipline.

12

As to the substance abuse component of her case plan, Nina testified that she participated in an assessment, but claimed the AOD counselors told her that "because of my circumstances that they were not sure what to do with me and that they would have to meet and decide what would be best. And at the moment that their services were not suited for me." She denied telling the counselor that AOD services would not do her any good because she had no intention of stopping her marijuana use. As to her numerous positive drug tests, Nina explained, "[U]p until probably July, I was totally unaware of the department's adverse views on marijuana, period. And I was told that as long as I could get my [medical marijuana] card, they would be okay with it. And then I found out that they were not okay with marijuana in any way, shape or form. So come July, I quit smoking marijuana. And the test in August, of course, I still had marijuana in my system, seeing as how it takes 30 days for it to completely exit the system." Nina blamed her failure to drug test in September on transportation issues, claiming she was unaware she was supposed to let the Department know she could not make the test.

Nina had a mental health counselor, but had not attended appointments due to her own transportation problems or the counselor being out of the office. She intended to schedule an appointment to see her the following week. When asked on cross-examination about the letter from the mental health branch detailing her poor record of engagement in services, Nina would neither admit nor deny the accuracy of the letter, claiming either she did not get messages because her phone was disconnected, was sick and thus missed appointments, or simply did not recall whether she missed a particular appointment as it was too long ago.

When asked about her suicidal thoughts in August, Nina explained that she was "having a moment of difficulty" and was "overwhelmed." She did not have anywhere to go or anyone to talk to, so she went to the emergency room. She denied that she had actually been suicidal or that it was anything serious.

Nina acknowledged that she did not participate in the Harrington House domestic violence program, testifying that it would have been traumatizing due to her childhood experiences of her mother dragging her to shelters and "homeless places" when her father

13

kicked her mother out of the house. She was, instead, participating in the Pre-CAPT program and was making significant progress. She denied that bruising on her arm was a result of a domestic violence incident, but was instead because she was "slightly anemic." Nina testified that she was attending as many classes as she could, adjusting scheduling conflicts where possible. According to Nina, through the program she learned that adult behaviors in the home can have a "snowball effect" on children, and that the more the adults could control themselves and maintain an air of civility, the better it will be for the children. She had gained insight into picking up on other's body language, better perceiving the situations around her, and thinking before reacting.

Nina described visits with her children as the only thing she looked forward to in her day. She acknowledged having some difficulty with Roman because he wanted to go play with other children during visits instead of spending the time with her and Robert. She denied ever telling him anything negative, claiming that his feelings stemmed from "normal sibling changes due to new family members," and that the older sibling often feels distance between a parent and him or herself when a new child comes along. To help Roman get past his feelings, she had tried to include him in changing and feeding Robert "and everything in between."

Nina did not believe the Department was providing adequate transportation services. Oftentimes she would call a day ahead of time, requesting transportation, but "it seems like they don't have time or they're unable or that they have other things in their scheduling to where they can't."

Closing arguments followed the testimony, with counsel for the Department arguing first. According to counsel, the testimony, along with the letters submitted in support of the Department's supplemental report, established that Nina had not completed her case plan, having made very little progress on alleviating the concerns that led to the dependency proceeding. Nina repeatedly told service providers that she did not have problems and that she was not going to change the way she was doing some things, and an additional six months of services would not lead to reunification under these circumstances.

14

Nina's counsel acknowledged that her performance "has not been perfect," but he argued there were some accomplishments, too, contending that she was a very bright person who was trying to do what she could to bond with her children. She herself grew up in a domestic violence situation, and "[s]ometimes people because of their own background take a little bit more time." He submitted that Nina had demonstrated she learned things from the programs she had completed. Describing the situation as "salvageable," he urged the court to give her more time, but "if she starts having dirty tests, any whatsoever, pull the plug."

Counsel for Roman's father expressed concern about Nina's lack of insight about the nexus between her behavior and the children's detention, and submitted on the recommendations of the Department. Counsel for James, who had lost contact with James, submitted on the record.

Counsel for Robert challenged Nina's statement that she "would do anything and everything to keep the children," arguing: "Those were her quotes, 'I would do anything and everything to keep the children.' Except get a home and tell the department about it; can't even leave a phone message; except go to mental health and be honest about the fact that I do need services in six months, actually lied about it; except deal with my anger through domestic violence or pre-CAPT; except stop using drugs and avoid testing. She's managed to avoid testing for two months; except basically do anything to be successful. Her attempt at accessing these services that have been offered to her have been, frankly, pathetic."

Robert's counsel was encouraged, however, by the fact that Nina was engaging in mental health services and that she had completed her parenting class. And while he had "grave doubts" that she could succeed at reunification, he was not opposed to continued services for Nina if services were continued for Roman's father.[4]

---

[4] Roman's father lived out-of-state, and the Department was attempting to reunify them.

CASA Gibbs reiterated his recommendation that Nina receive three more months of services. According to Gibbs, his associate, who was a very experienced CASA staff member, spoke with Nina and came away from the conversation impressed and very hopeful that reunification was possible.

Following arguments, the court found by clear and convincing evidence that Nina failed to make substantive progress on her court-ordered case plan, as follows:

"Mother, by her account, has lately been involved. But I—I have to say, I didn't find mother convincing. She seemed to think that—or have me believe that other people are lying and that she's really done much better than what the other evidence I have from multiple other sources would indicate.

"It appears to me that she does need mental health help, and she has not made substantive efforts or progress. Appears to be late getting started in that as well as the pre-CAPT, the child abuse prevention treatment program. She has not done anything with AOD.

"She self-reports being free from marijuana since July, but offers nothing to substantiate that other than her own testimony that she had an early test that was dirty in August and then twice declined to test when ordered to do so or requested to do so in September. So I—frankly, given all the other things which cause me to doubt her credibility, I have a hard time believing what she said.

"She says she graduated from the parenting class; maybe she did, but she didn't provide it to us. This is the hearing. And the last information that the social worker had last week was that she had not.

"I have at times seen certificates given to somebody who has gone to some of the classes even though they haven't finished them. And I don't know what she got was a certificate that says that she actually completed the class or that she did participate by going to a certain number of classes. I don't know. I know that program, I think, at least in the past has given both types of certificates.

"Her visitation has been at times regular, but at other times not. Her appreciation of the needs, particularly, of the older child have been, frankly, very disturbing and does

16

not appear to be sensitive to Roman's predilection to using women or dressing in girls' clothing[. That] is concerning—maybe understandable, but that's nevertheless concerning.

"Her failure to address the housing issues—all she could tell us today is that she lives somewhere on Murphy Street, doesn't tell us who she is living with, indicates she's only been there for apparently three nights. It's hardly progress in dealing with her homeless problem.

"It clearly appears to me that the department has provided services, reasonable services, including trying to find housing and jobs.

"I have to say I found Ms. Anderson's testimony to be particularly convincing. It appears to me that the department has done a professional job and attempted to find— provided reasonable services to the mom. In contrast, mother's testimony has not been convincing."

With that, the court terminated Nina's reunification services as to Robert and set the matter for a section 366.26 hearing on January 24, 2014.

Nina filed a petition for extraordinary writ on October 23.

## DISCUSSION

**The Trial Court's Finding That The Department Provided Adequate Services Was Supported By Substantial Evidence**

When a child is removed from a parent's custody, the Department must provide child welfare services to the parents to facilitate reunification of the family. (§ 361.5, subd. (a).) The services must be tailored to the particular needs of the parents and designed to eliminate the conditions that led to the child's removal from their custody. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010-1011; *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1458; *In re Edward C.* (1981) 126 Cal.App.3d 193, 205.) "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made

17

reasonable efforts to assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)  Those criteria were easily met here.

From the outset of the dependency proceeding, the Department was very clear about the issues that prompted the removal of Robert from his parents' care:  they had substance abuse issues and neglected Robert when he was suffering from a serious illness; their relationship was violent; and James was abusive towards Roman.  The Department provided Nina access to an extensive array of services geared towards remedying those problems and attempted to facilitate her engagement in those services.

Specifically, the Department referred Nina to AOD for a substance abuse assessment; the mental health division for a mental health assessment; Incredible Years for a parenting education program; and the Linkages program and Workforce Center for assistance with finding housing and employment.  Nina was also referred to the Harrington House domestic violence program, and was transported to the program on three or four separate occasions.  When Nina objected that participating in the program would be traumatizing for her, the Department referred her to the Pre-CAPT program as an alternative.

In addition to the above referrals, the Department provided Nina with transportation options.  When given sufficient notice, it would try to arrange rides for her.  As an alternative, she was given a monthly bus pass.  She was also provided with a phone containing 400 minutes per month.  The Department also arranged a visitation schedule that afforded Nina five hours per week with her children.

Lastly, social worker Anderson was actively involved in Nina's case, meeting with or speaking to her weekly in order to follow her progress and assist her in completing her case plan.  Nina was also assigned a social service aide to help her fulfill her responsibilities.

In the two-page argument in her petition, Nina attempts to persuade us that social worker Anderson was "dilatory and lax" and "ill prepared," paid no attention to Nina's case, lacked knowledge of her progress on her objectives, and "caused the failure of the case plan."  The veracity of this portrayal is belied by the record.  The purported

18

examples Nina provides are based on either a twisted construction of Anderson's testimony or Nina's unsubstantiated, self-serving testimony.  And to the extent her claims are based contradictions between her testimony and that of Anderson, the court specifically found Nina lacking in credibility and Anderson "particularly convincing."

We thus conclude that Nina's allegations are meritless.  Viewing the evidence in the light most favorable to the order, we further conclude that the juvenile court's finding that the Department provided reasonable services was supported by substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

### The Trial Court's Finding That Nina Failed To Make Sufficient Progress on Her Case Plan Was Supported By Substantial Evidence

At the six-month review hearing, the juvenile court must order return of the child to the custody of his or her parent, unless it finds, by a preponderance of the evidence, that the return of the child would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  (§ 366.21, subd. (e).)  The failure of the parent to participate regularly and make substantive progress in his or her case plan is prima facie evidence that return would be detrimental.  (*Ibid*.)

We review findings made under section 366.21 for substantial evidence. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020; *Dawnel D. v. Superior Court* (1999) 74 Cal.App.4th 393, 398.)  "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion.  [Citation.]  The appellant has the burden of showing the finding or order is not supported by substantial evidence."  (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250–251.)  Under this standard, we conclude that the juvenile court's finding that Nina had not made substantive progress on her case plan was supported by substantial evidence, and termination of services was thus appropriate.

Addressing the objectives of Nina's reunification plan in order, we begin with the requirement that she maintain a relationship with her children by following the conditions of the visitation plan and developing a strong relationship with them. Despite describing visits with her children as the only thing she looked forward to in her day, Nina's record on visitation was inconsistent. Anderson estimated that she attended 60 to 70 percent of the scheduled visits, sometimes visiting weekly but other times missing a series of visits without first notifying the Department.

The second objective was for Nina to develop the necessary parenting skills to enable her to consistently, appropriately, and adequately parent her children. In furtherance of this objective, Nina was referred to the Incredible Years parenting education program. While she did participate in the program, she failed to attend the final class, and as of the date of the Department's six-month review report, she had not completed the program. Nina testified that she had in fact received her certification of completion, but neither social worker Anderson nor the court had ever seen it, nor was there any corroborating evidence that she had in fact completed the program. Further, Nina continued to be short with Roman and say hurtful things to him during visits, suggesting she has not grasped core concepts of the program.

Nina's performance on the third objective—comply with medical or psychological treatment—was perhaps the least successful. She was initially referred for mental health services in March, but she ignored attempts to schedule an assessment, resulting in the closure of her file. After a second referral in April, she skipped an appointment, finally participating in an assessment in May. She again ignored attempts to schedule her next appointment, and it was not until the end of June that she participated in the development of her treatment plan. Consistent with her prior behavior, she failed to schedule an appointment to begin her therapy, and her file was again closed in late July after attempts to reach her failed.

In addition to failing to schedule or attend appointments, Nina persisted in her belief that she did not need mental health services. When presented with a treatment plan, she denied needing treatment, advising the counselor she would not participate. She

20

also lied to Anderson, claiming the counselor told her she did not need treatment, a representation directly contradicted by the counselor herself. As evidence that Nina did indeed have mental health needs, she sought emergency medical treatment in August when she had suicidal thoughts. Even after that experience, Nina failed to pursue services, connecting with the mental health bridge team on one occasion but ignoring all other phone calls and appointments.

Nina made little to no progress in acquiring coping skills to resolve domestic violence concerns. She refused to participate in the Harrington House program, so the Department referred her to Pre-CAPT as an alternative. As of September 16, she had attended her intake appointment and one group meeting and part of a second. She claimed that through the program she had learned how her behavior could impact her children, but despite this supposed growth, she became very upset in front of her children at two recent visits.

Lastly, Nina was required to refrain from drug use and comply with drug testing requirements. She failed to make any progress on this objective, despite that her substance abuse was one of the key issues necessitating the dependency proceeding. As late as August, Nina was still testing positive for marijuana, and she refused two requests to test in September. Nina testified she had been clean since July, but offered no evidence to substantiate her claim. And given her statements that she had no intention of stopping her marijuana use, the court had "a hard time believing" her claim that she had been drug-free since July. Further, Nina was referred to AOD and participated in an assessment, but due to her refusal to stop her marijuana use, she made no progress on a treatment program.

Compounding all of the foregoing, at the six-month review, Nina was unemployed—other than occasional babysitting—and failed to follow through on any efforts to secure employment. The Department had referred her to the Linkages program and Workforce Center in March, and she attended one meeting with a Linkages counselor, but failed to complete the assigned work. After that, she failed to avail herself of the services of either program, claiming she thought it was "merely a suggestion."

21

Nina had an appointment at Linkages two days after the hearing and one at the Workforce Center the following week. But it is not lost on us that she scheduled these appointments only after the Department recommended termination of reunification services. And, as demonstrated above, Nina's record of keeping appointments was less than stellar.

Additionally, Nina could not tell the court the "exact address" of where she was living, claiming she had been staying at a friend's house on Murphy Street for the past three nights. According to the CASA, Nina had applied for HUD housing, but the wait could be as long as two years. The Department was willing to help Nina with a security deposit or first month's rent, as long as she demonstrated that she could pay the rent after that, but she made no such showing.

Finally, perhaps Nina's biggest obstacle to reunification was her refusal to acknowledge her behavior that led to the dependency proceeding. From the very outset, Nina adhered to the position that she had "not done anything wrong" and there was nothing she needed to remedy. In Anderson's experience, if a parent was unwilling to recognize the problem, then treatment generally did not occur.

In light of the foregoing, we easily conclude that substantial evidence supported the juvenile court's finding that Nina failed to make sufficient progress on her case plan to warrant an extension of services.

## DISPOSITION

The petition of mother Nina P. for extraordinary writ relief is denied on its merits. (Cal. Rules of Court, rule 8.452(h)(1).) This decision is final as to this court forthwith. (*Id.*, rule 8.490(b)(1).)

22

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Haerle, J.